## Louisville, Henderson & St. Louis Ry. Co. v. Gregory's Admr.

Appeal from Breckinridge Circuit Court.

DISSENTING OPINION BY JUDGE NUNN.

Appellee instituted this action to recover damages for the loss of Emmett Gregory's life, alleging that it was caused by appellant's negligence in failing to equip its train as required by section 778 of the Kentucky Statutes, and in allowing the steps and platform of the passenger coach in which Gregory was a passenger, to become covered with ice and slippery, and in permitting him to alight from the coach while it was on the trestle; that by reason of these alleged negligent acts, Gregory fell from the trestle to the ground, a distance of about thirty feet, and received injuries which produced his

death soon thereafter. On a trial of the case, the lower court eliminated the questions of icy steps and platform and the improper equipment of the train, and submitted only the question as to what care those in charge of the train should have taken of Gregory, under the circumstances, while the train was standing on the trestle and at the time he fell therefrom. As stated in the opinion, the train was stopped on the trestle by a break in the air hose. The witnesses for appellant do not agree or make any definite explanation as to what the trouble was with the hose or as to what caused it to break. One witness leaves the impression that the pipe broke, and another that a section of the hose became detached and lost. They seem to be at a loss to account for it. There can be no doubt but that the stopping of the train on the trestle was the cause of Gregory losing his life, but this matter was not submitted to the jury. In submitting the only question presented, the lower court told the jury that if they believed from the evidence that Gregory was a passenger on the train and in a helpless state of intoxication, or intoxicated to such an extent as not to be able to take proper care of himself, and was invited or permitted by appellant's agents to walk or slip or fall from the train, whereby he lost his life, they would find for appellee, unless they further believed from the evidence that Gregory so contributed to his own death that but for his negligence he would not have lost his life. Upon appellant's request, the lower court gave the jury instructions 7, 8 and 9, which are as follows:

"7. The court further instructs the jury that if they believe from the evidence that when the defendant's train stopped on the trestle, on the occasion mentioned in the petition, the deceased, Gregory, was sufficiently sober to know what he was doing, or that the defendant's agent and servants in charge of said train had no notice or knowledge of his not being in that condition, and such agents and servants of the defendant then and there notified said Gregory and told him that the train was on the trestle and that he must not get off at that point and notwithstanding such notice or warning the said Gregory went to or remained upon the platform and in this manner slipped or fell from said platform and lost his life, then the law is for the defendant and the jury must find for the defendant.

"8. The court further instructs the jury that the defendant's agents and servants in charge of the train mentioned in the petition, owed no duty to the deceased Gregory on the occasion when he lost his life, not common to other passengers on the train, unless his condition was such as to render him incapable of taking care of himself and not then unless the defendant's agents and servants in charge of said train had notice or knowledge at the time of such condition, and if they believe from the evidence that at the time of the accident the employes of the defendant gave notice to the decedent and other passengers that the train had stopped on the trestle and was not at the station, and that said Gregory heard and understood the warning, and was able to heed it, then, and in that event said Gregory had no right to go out on the platform of the car, or to remain on said platform, if he did so, and fell or slipped or walked from said platform and was killed, the law is for the defendant and the jury should find for the defendant.

"9. The court further instructs the jury that if they believe from the evidence that the deceased, Gregory, when he boarded the defendant's train at Louisville, and while riding thereon as a passenger was able, or apparently able, to take care of himself, and that defendant's employes in charge of said train had no notice or knowledge that he was not able to take care of himself while on said train, then and in that event such employes were not bound in law to anticipate that said Gregory would require extra care or attention, if he did require it, and if such employes gave said Gregory and the other passengers notice and warning that said train was on the trestle and not at the station and that such warning was sufficient to prevent an ordinarily prudent person from going on the platform, or remaining thereon or attempting to alight therefrom and that notwithstanding such warning said Gregory remained on said platform, or slipped or fell or attempted to alight therefrom then the law is for the defendant and the jury should find for the defendant."

The jury found from the evidence that the servants of appellant were negligent and Gregory was in such an intoxicated condition that he could not and did not properly appreciate his dangerous situation and those

in charge of the train knew that fact, or else they would have been compelled to find for appellant. Yet, this court decided that there was no evidence upon which to base such a verdict. Let us examine the testimony and see whether or not there was. Appellee's witnesses upon this question were W. E. Davis, M. L. Howard and Miss Rebecca Willis. None of them were related to Gregory or interested in the result of the litigation. M. L. Howard was the conductor on the train Gregory fell from. Appellant's witnesses were Geo. Miller, Sam Berry and Harry Thompson, all of whom are employes of appellant and were, together with Howard, in effect, charged with failing to do their duty to protect Gregory from harm. It is true that the witnesses for appellant above named testified that they did not discover that Gregory was drunk or that he needed any more attention than passengers usually do, yet the jury, there being other facts and circumstances testified to, was not bound to give their testimony in that regard full credit. M. L. Howard, the conductor, testified that he had known Gregory for four or five years; that Gregory boarded his train in Louisville, and further testified as follows:

"Q. What was his condition when he got on there as to sobriety or intoxication?"

"A. Well, he wasn't a man that I would consider drunk."

"Well, was he intoxicated?"

"A. Knowing him as I did, if I hadn't known him possibly I wouldn't have considered him drinking at all, but I knew him, and in that way I knew he was drinking, or thought he was." * * *

"Q. Where did you see Gregory first that evening?"

"A. On the train, do you mean?"

"Q. That evening, on the train or off the train, where did you see him?"

"A. Do you mean after leaving Louisville?"

"Q. No, before?"

"A. In the depot."

"Q. What state of intoxication was he in then?"

"A. Well, he walked through the depot there. I wouldn't consider him a drunk man. As I said, knowing him as I did, I noticed that he was drinking."

"Q. I want to ask you whether or not in giving your

depositions this question was put to you, and whether you made this answer: 'Q. What degree of intoxication was he in? A. Well, he could get along with what he had. Q. He could walk you mean? A. Yes.' Is that what you said?''

"A. Yes, sir."

"Q. How long was it from the time you saw him in the depot until you saw him getting on the train?''

"A. I didn't see him get on the train."

"Q. How long was it before you accepted his ticket as a passenger to Cloverport?''

"A. Possibly an hour, I don't remember how long, it might have been an hour and a half."

"Q. At that time he was drinking?''

"A. I considered him so."

"Q. Well, did you see him at intervals from that time to Cloverport, when you passed through the train?''

"A. Possibly three or four times, I don't remember just how many." * * *

"Q. And you say that Mr. Gregory was intoxicated the first time you saw him, and he was intoxicated the first time you received him as a passenger?''

"A. I didn't say that he was intoxicated. I didn't say that he was a man I would call intoxicated. I said knowing him as I did I thought he was drinking."

"Q. How long have you known him?''

"A. I couldn't tell you exactly, some six or seven years."

"Q. Well, when you took and punched his ticked you thought the same thing did you?''

"A. I hadn't changed my mind any."

W. E. Davis testified as follows:

"What was his condition?''

"A. Well, when I seen him, I was back in the smoker and he came back, and there was only two of us in there when he came in. And he came in and he and this other man got to passing the bottle."

"Q. Drinking?''

"A. Yes, sir."

"Q. Well, what was his condition at that time, was he already intoxicated?''

"A. Well, he was under the influence to some extent."

"Q. What size bottle were they passing?"

"A. I think it was a pint bottle."

"Q. Well, then, when did you next see him?"

"A. I never seen him any more until the train stopped down near Cloverport."

"Q. What do you know further about him?"

"A. Well, when they stopped there he came through the train, and when he got to the door, there was three of them as if though to get off, and when they got to the door of the front end of the coach, they stopped there, and I think the conductor or brakeman or some of them said to them 'we are not at the station yet, wait a while, go back and sit down,' and they stopped, and the lady and one man went back and sat down, and this man Gregory he didn't come back in the coach, he stood at the door."

Miss Rebecca Willis testified as follows:

"Q. Who was sitting next to you when this call (for Cloverport) was made?"

"A. There wasn't any one."

"Q. No one—Who reached the platform first you or Mr. Gregory?"

"A. Why, I was—He did."

"Q. Was any one with Mr. Gregory?"

"A. Yes, sir, the flagman was with him."

"Q. Who was this flagman, please, Miss Willis?"

"A. I didn't know his name at the time."

"Q. But you knew he was the flagman?"

"A. I supposed he was."

"Q. State whether or not he had hold of Mr. Gregory as he walked up the aisle?"

"A. Yes, sir, he did."

"Q. How did he hold him, please?"

"A. Why, I don't remember exactly, I just know he had hold of his arm coming through the car, I don't remember exactly."

"Q. Now did they go past you before you had arisen from your seat?"

"A. No, sir, I was almost to the door, and I stood aside and let them pass me."

"Why did you let them pass you, why did you stand aside?"

"A. Well, because I did, just wanted them to pass me."

"Q. Can you tell, Miss Willis, what the condition of Mr. Gregory was at this time, when you stood aside and let them pass, with reference to being intoxicated or not?"

"A. Well, he seemed to be. I thought at the time that he was, and that was one reason I stood aside."

"Q. Now did the flagman, Miller, have hold of his body or arm?"

"A. Had hold of his arm"

"Q. Which arm was it, please?"

"A. I don't know."

"Q. Don't know which arm it was? How close were you to the door when you stopped and let them pass you?"

"A. I don't remember how close I was."

"Q. Did or not the flagman go through the door on to the platform of the car?"

"A. The flagman was with him and went with him out the door."

"Q. They both went together out of the car on the platform?"

"A. Yes, sir."

"Q. Then where did the flagman go if he went any where?"

"A. I don't know, I wasn't paying any attention."

"Q Did you see him leave this platform or not, this car platform?"

"A. See the flagman leave?"

"Q. Yes?"

"A. I don't remember, I didn't pay any attention."

"Q. State whether or not the flagman and Mr. Gregory were out upon this platform at the time the train stopped?"

"A. Yes, sir, they were."

"Q. Were you outside on the platform when the train stopped?"

"A. I was right in the door " * * *

"Q. After the train stopped what did you do?"

"A. Well, after the train stopped, I went back and sat down in the car."

"Q. At the same place from which you had arisen or not?"

"A. No, sir. I sat down at the front of the car.

Let me see. I was standing in the door at the time the train stopped, and Mr. Howard said that we had stopped on the trestle, so I went back, and he said we had stopped on the trestle, and he turned around to Mr. Gregory then and told him we had stopped on the trestle."

"Q. Where was Gregory when he told him that?"

"A. He was standing on the platform."

"Q. Did Mr. Howard have hold of him?"

"A. I don't remember whether he did or not."

On cross-examination, Miss Willis testified as follows:

"Q. If I understand you, the brakeman simply had his hand on Mr. Gregory's arm as he passed you in the aisle?"

"A. Yes, sir."

"Q. He was not shoving him or carrying him or anything like that?"

"A. I don't remember anything about them. I remember he had his hand on his arm and seemed to be leading him."

Miller, the flagman, testified that he was at the steps of the coach when Gregory took passage on the train in Louisville. and continued as follows:

"Q. Did you see him afterwards while he was on the train?"

"A. Seen him once, after going through the train at Irvington. That was the same man that I seen on the platform at the station, was the same that I seen in the smoker."

"Q. What was his condition, was he drunk or sober?"

"A. Perfectly sober when I seen him."

"Q. If there was anything wrong with him you didn't observe it?"

"A. No, sir."

Sam Berry does not testify to seeing Gregory leave the car, but testified as follows:

"Q Did you see him at any time?"

"A. I seen him standing on the platform of the car."

"Q. Front platform?"

"A. Yes, sir."

"Q. Was it before or after the train had stopped?"

"A. After the train had stopped."

"Q. What was he doing on the platform?"

"A. Just standing there looking through the door, the door was shut."   *   *   *

"Q. And you hadn't seen Mr. Gregory at all up to that time?"

"A. No, sir."

"Q. Didn't know he was on the train?"

"A. Yes, sir."

"Q. Did you know him?"

"A. Yes, sir."

"Q. Well, you did see him afterwards on the platform there looking out in the door, what was his condition so far as you could see?"

"A. I couldn't tell anything of his condition, sir."

"Q. Couldn't tell anything about it?"

"A. He was just like any other man."

"Q. Just standing around there like anybody else would be?"

"A. Yes, sir."

"Q. As far as you could see, was he able to take care of himself?"

"A. He seemed as able to take care of himself as I was to take care of myself."

Harry Thompson testified as follows:

"Q. Did you see him (meaning Gregory) between Louisville and Cloverport?"

"A. Yes, sir."

"Q. State to the jury what his condition was in your judgment, was he drunk or not?"

"A. No, sir, not that I know of, he wasn't."

"Q. Did you see him drinking?"

"A. No, sir, I did not."

"Q. Had you known him before that time?"

"A. No, sir."

"Q. Did you sit in the smoker at any time or for any portion of the time while Mr. Gregory was in there?"

"A. Yes, sir, I sat in there about five minutes, I guess."

"Q. Did you talk with him?"

"A. Well, no, I never talked with him any. I was just sitting in the smoker there with him."

"Q. Mr. Thompson, you remember I presume that the train stopped on the trestle there before it reached the station at Cloverport?"

"A. Yes, sir."

"Q. Where were you sitting when that train stopped."

"A. Well, I was sitting about the third seat from the rear end, just outside of the compartment from the smoker into the ladies car, about the third seat from the door."

"Q. You were in the main body of the chair car?"

"A. Yes, sir."

"Q. Did you see Mr. Gregory coming through the car on his way to the front end?"

"A. Yes, sir."

"Q. Where was he at the time the train came to this sudden stop?"

"A. Well, he was just opposite me, just about one seat ahead of where I was sitting at."

"Q. The train stopped suddenly, did it?"

"A. Yes, sir."

"Q. What kind of a stop did the train make?"

"A. It made a sudden stop, nothing unusual, but a sudden stop."

"Q. What effect does that have on a man standing in the aisle, or walking along, whether he is drunk or sober?"

"A. Well, a stop like that will make anybody stagger, when it first stops why he will go ahead for two or three steps, and when the train does stop he will come backwards two or three steps."

"Q. Sometimes that throws people down?"

"A. Yes, sir, sometimes it does."

"Q. What effect did it have on Mr. Gregory when it stopped that way, you say he was near you, and perhaps just a little in advance of you?"

"A. Well, the same as it would on me or anyone else, I suppose."

"Q. What did you do then?"

"A. Well, just about the time that he got even with me I got up out of my seat  Of course when the train stopped I fell over against the seat, the seat just ahead of me, and when he started staggering backwards, I steadied him up with my arm to keep him from falling backwards."

"Q. Did you walk with him from that point to the

front of the car?"

"A. I did."

"Q. Could he walk all right?"

"A. Yes, sir, as good as I could down there."

"Q. Did he require or need support from you after that motion of the train was over?"

"A. No, sir. he did not."

"Q. Was there anything in his manner or condition as far as you could observe it, to indicate that he was drunk?"

"A. No, sir."

"Q. I believe you stated that he walked all right, as good as you did?"

"A. Yes, sir."

"Q. Now state to the jury whether you were under the impression also that the train had stopped for Cloverport as you walked forward?"

"A. Yes, sir, I was at that time."

"Q. When did you learn otherwise?"

"A. When I got down to the door."

"Q. Did you learn it from anybody else, or did you learn it from what you could see when you got to the door?"

"A. From what I could see."

"Q. You saw you were on the trestle, did you?"

"A. Yes, sir."

"Q. What did you do then?"

"A. What did I do when I got there?"

"Q. When you saw you were on the trestle what did you say or do or both?"

"A. Oh, well, as quick as I saw we were on the trestle, why I pushed Mr. Gregory back on the inside, and told him, I said, you stand here until I come back and tell you we are at Cloverport, we are here on this trestle, and so he said all right, and I goes on back to the rear end to see what the trouble was."

"Q. You left him standing there inside the door of the coach?"

"A. Yes, sir, I did."

All the witnesses who testified on the subject, said that when Gregory was found after he fell, he had a quart bottle one-half full of whiskey. The testimony shows that Gregory was a considerable drinker; that

Howard, the conductor, had known him for a long time; that he discovered by reason of his acquaintance with him, an hour before the train started from Louisville, that Gregory was under the influence of liquor; that Gregory drank on the train in the presence of Davis in the smoker; that he and another man were passing a pint bottle, and that when he was found under the trestle he had a quart bottle with one-half of the whiskey gone.

When Cloverport was announced, Gregory and the other passengers to get off at that place, started to the front of the coach. Thompson, the brakeman, stated that he caught and steadied Gregory near the back end of the car, when the train stopped, and lead him to the front platform. The testimony shows that Howard, the conductor, was on the front platform at that time and announced that the train was on the trestle and not to get off; that he said that to Gregory. All the witnesses say that Gregory remained on the platform from the time that the brakeman, Thompson, lead him there, except Thompson, and he says he opened the door and pushed him back into the car and told him to stay there. Perhaps the jury thought it somewhat strange that if Gregory was as sober as any one. even Thompson, that Thompson thought it necessary after steadying him from the shock caused by the stopping of the train, to lead him from that point to the platform, and after finding that they were on the trestle, to push him back into the car and tell him to stay there until he came back and told him that they were at Cloverport. And again, is it not strange that Gregory, a grocer, a bookkeeper and a man of intelligence, if he were sober, would suffer himself to be lead down the aisle of a lady's railroad coach. Miss Willis thought Gregory was drinking when Thompson lead him down the aisle, and for that reason stepped aside and let them pass her and go to the front platform. Thompson's statements show that Gregory was entirely sober, but his acts contradict his words. He says that he steadied Gregory in the back end of the lady's coach, but all the other witnesses say that he was out on the platform when the train stopped on the trestle and that he never entered the coach any more. Thompson says that he caught him in the aisle and kept him from falling, and lead him to the platform. If Gregory was duly sober, why did Thompson push him back into the car and

tell him to remain there until he came back and told him to remain there until he came back and told him that they were at Cloverport? Thompson's acts show that he knew Gregory was in a drunken condition, therefore, there was, at least, a scintilla of evidence to this effect, and the invariable rule established by this court is that when there is a scintilla of evidence conducing to show a right of recovery, the case should be submitted to a jury. (Shay v. R. & C. P. Co., 1 Bush, 109; Stevens v. Brooks, 2 B. M., 140; Thompson v. Thompson, 17 B. M., 27; Buford v. L. & N. R. R. Co., 82 Ky., 286; Goetz's Admx. v. L. C. & L. R. R. Co., 79 Ky., 598; Eskridge v. C. & O. N. T. Co., 89 Ky., 367; M. & C. P. Co. v. Nagle, 97 Ky., 9, and L. C. Co. v. Walters, 22 Ky. Law Rep., 137.) The testimony in this case tends to show that Gregory was in a drunken, mauldin condition; that Howard and the brakeman knew it, and it was a question for the jury as to whether or not they gave him the attention and protection required by the circumstances. Appellee had a constitutional right to have this question submitted to a jury, and the court violates the Constitution when it assumes to pass upon that question. as there was some evidence, as is shown, to establish appellee's drunken condition.

For these reasons, I dissent from the opinion by the court.